PUERTO RICO HOUSING AUTHORITY, Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, LUIS R. POLO, JUDGE, Respondent; XAVIER ZEQUEIRA, Intervener.

No. 2354.    Submitted May 5, 1960.—Decided April 11, 1961.

*Berta Font de Estades, Pablo Defendini, Octavio Malavé Torres* and *Luis Torres* for petitioner. *Víctor Gutiérrez Franqui, Luis F. Sánchez Vilella, C. Morales, Jr.,* and *Federico Ramírez Ros* for intervener.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

We issued a writ of certiorari pursuant to § 28 of Act No. 376 of May 8, 1951—32 L.P.R.A. § 3228—to review the judgment rendered by the Superior Court, San Juan Part, affirming an arbitration award in the cases of *Puerto Rico Housing Authority* v. *Xavier Zequeira*, 55-6073 and *Zequeira* v. *Housing Authority*, 56–426 (consolidated) involving the impeachment and confirmation, respectively, of the award.

On July 12, 1949 the Authority and Zequeira entered into a contract for the construction of the San José Housing Project, PRHA-17, for the price of $987,976. Pursuant to article 17 of said contract, (*a*) all the disputes regarding questions arising under §§ 35 to 49 of the General Conditions shall be decided by the Housing Authority, and such decision shall be final and binding on the parties, except as otherwise expressly provided in the contract. (*b*) All other disputes

arising under the contract shall be decided by the Executive Director, except the disputes regarding the granting and the amount of claims which would involve a change in the contract price, such disputes were to be decided by the Executive Director, subject to arbitration. If the Authority or the contractor requests the arbitration of any of said disputes, a written notice of said petition shall be served on the other party within ten days from the date of the decision or the claim, with regard to which arbitration is requested. If no arbitration is requested, the decision or claim shall be final and binding on the other party. A referee shall be appointed by the Authority and another one by the contractor, and if within ten days the referees are unable to agree, they shall appoint a third referee and a majority of two shall be conclusive. The works shall in no case be suspended during arbitration, except by written instructions from the Executive Director authorizing a stop in the works.[1]

In accordance with the evidence presented before the referees who rendered the award object of this proceeding, at the hearing held by them, the following took place: Part of the project consisted in an area to be filled, for which a topographic map was drawn indicating the existing levels, and another for the final fill to be made in the works according to the contract. Realizing that there was something

---

[1] A controversy arose between the Authority and Zequeira, and they appointed their respective referees who disagreed in their written reports. The third referee considered both reports and on October 6, 1955 he rendered his own with his findings in favor of the contractor. On December 29, 1955 the Authority impeached this award before the Superior Court, San Juan Part, among other reasons, because it was not made within the term fixed by law; because it was not signed by all the referees or by a majority thereof, and because errors were committed which impaired the rights of the Authority when the third referee based his conclusions on evidence submitted in his absence, all this constituting an alleged violation of Act No. 376 of May 8, 1951. On May 2, 1956 the Superior Court set aside said arbitration award for noncompliance with the procedural requisites, and not finding any grounds for incompetence on the part of the referees, it provided that the controversy be submitted to them once more with the opportunity for both parties of being heard and of presenting evidence.

that was not clear with regard to the points indicated in the topographic map drawn by the Authority, the contractor requested the latter to draw a new plat and to make new points within that area in order to verify the correctness of the lines drawn in the former plat.

On April 20, 1950 the contractor wrote to Mr. Hidalgo, the engineer of the Authority, requesting information as to the topography which had been ordered by the Authority and stating that the natural grade which appeared on the plats was not the actual one for the reasons he set forth, and that this changed the conditions of the contract. He requested to negotiate the relevant change order. On May 5, 1950, the engineer, Mr. Hidalgo, told the contractor that a topography which the Authority ordered at his request was completed and that the computations to determine whether there was to be a change in the volume of the fill were being made and that possibly there would be an increase. As soon as the reports were completed, they would prepare a change order to cover the difference.

On December 4, 1950 the Authority sent the contractor Change Order No. 13, informing him that upon reconsidering the fill to be deposited in a specific area, additional fill was needed in the amount of 2,287.74 cubic yards, which the contractor would proceed to deposit in accordance with the original plats. A new plat indicating measurements data was included and an equitable adjustment of the contract price was made in the amount of $1,687.75. Said change order was broken down as follows:

*"Additions:*
    2.287.74 cubic yards of fill at $0.80                $1, 830. 19
*"Deductions:*
    284.88 cubic yards of excavation
        at $0.50                                            142. 44
    Total additions:                    $1, 830. 19
    Total deductions:                        142. 44
                                         _____
    Total increase in the contract price:    $1, 687. 75"

On March 6, 1951, the contractor wrote to the Authority with regard to the above-mentioned Change Order No. 13, stating that he did not accept it because the amount of fill involved was greater than the one mentioned therein by a total of 42,364 cubic yards, which at $0.80 per yard, amounted to $33,891.20 without including the 15% stipulated for the contractor. That the new grading prepared by the Authority at his request had been made without his intervention, and he requested that a new change order be made for the difference in the amount of fill which was actually used in the project. On May 7, 1951, the contractor informed the Authority that subsequent to the former letter he had deposited the additional amount of 2,134.56 cubic yards of fill which at the rate of $0.80, amounted to $1,707.65, his claim thus amounting to $35,598.85, without including the 15% for the contractor.

On December 18, 1951 the contractor sent a letter to the Executive Director, referring to conversations held with Mr. Hidalgo, the engineer, regarding the liquidation of the projects, setting forth that the condition different from project No. 17 was the levels appearing on the topographic map which indicated points which were not true, and reaffirming that the change order was made for an amount of fill less than the actual one. That since Mr. Hidalgo required him to offer a new map to support his claim, he was negotiating with the firm of Deer & Capacete to make the necessary estimates and to calculate the amount of fill furnished by him.

On October 24, 1953, the contractor sent to the Executive Director a survey made by the Foundation Engineering Co. of Puerto Rico, consisting of a topographic map of the area filled in the San José Project, which determined the amount of fill existing therein, the contractor reasserting that the original topographic map drawn by the Authority was not correct since it marked the wrong lines, and hence the existing

conditions differed from those shown in the plats. He pointed out that said firm had found 120,603 cubic meters of fill, 33,870 more meters than the number in the original plat, which represented 44,302.16 cubic yards or $35,441.61 at $0.80 per yard according to the price agreed upon, plus the 15% making a total of $40,757.84, less $1,687.75 accredited by Change Order No. 13. On November 9, 1953 and in relation to this letter, the Executive Director communicated to the contractor that having studied the documents related to the contract and the history thereof, they did not find any grounds whatsoever to justify the claim and they denied it.

On December 1, 1953 the contractor wrote to the Executive Director and referring to conversations recently held with regard to his claim and to a suggestion made by the Director as to the convenience of having the engineers of the Foundation Engineering Co., who made the survey concerning the fill used in the works, appear at a hearing to be held before the Director in order to discuss the details of the report, he asked for the date and hour of said conference to see whether they could arrive at a final decision of this problem that would be satisfactory to both parties. On January 4, 1954, the Executive Director wrote to the contractor confirming what he had told the latter during a conference held on December 4, that in view of the circumstances of the case and of the terms of the contract there were no grounds to justify his claim.

On January 13, 1954, the contractor wrote to the Executive Director requesting that the controversy regarding the excess of fill be submitted to arbitration pursuant to paragraph 17(b) of the contract, and informed him that he was appointing Gustavo E. Padilla, attorney-at-law, as his referee. On February 3, 1954, the Executive Director answered the former letter informing the contractor that he had appointed Jorge J. Jiménez, engineer, to act as referee on behalf of the Authority with regard to this dispute.

In addition to the documentary evidence above-mentioned, the result of a report rendered by the firm of Deer & Capacete, dated October 8, 1953, was also brought before the referees. The contractor as well as the Executive Director and other officials of the Authority, the latter represented by its counsel, set forth before the referees their full explanation regarding said documentary evidence and the surveys made by the two firms afore-mentioned, they sustained their own opinions with regard to the technical aspects involved in the controversy and gave their respective interpretation of those parts of the contract related to the dispute. The referee appointed by the contractor, Gustavo E. Padilla, attorney-at-law, and the third referee, Joaquín Oliver, signed an award wherein they set forth ten findings.[2] In the light thereof, they decided that the contractor had a right to an additional payment on account of 28,460.20 cubic meters of fill at the unit price of $1.07, amounting to the sum of $30,452.41; and that the contractor did not have a right to the payment of 15% from the industrial gains because his profits were included in the quoted price of $1.07. The referee appointed by the Authority, Mr. Jiménez, set forth in the document itself that although he agreed to the ten findings made by the other two referees, he did not approve the decision to make an additional payment since it was a lump-sum contract and because the evidence did not establish bad faith on the part of the Authority in the drawing of the topographic map, but that it was a casual error.

The Authority impeached the award before the Superior Court and the contractor, on his part, requested the affirm-

---

[2] They appear as Appendix A at the end of this opinion.

[3] The reasons adduced by the Authority to impeach the award were the following: (a) that the additional sum of $30,452.41 granted to the contractor on account of the excess fill was a violation of the terms of the contract under which he was bound to furnish the additional fill within the lump-sum of $987,976; (b) that the referees changed the nature of the contract from a lump-sum one to a unit price contract; (c) that the

ance thereof.[3]  Having heard the parties, the trial court made the following conclusions of law:   (1) in order to determine the validity of the arbitration award in this case, Act No. 376 of May 8, 1951 is applied, since it authorizes and regulates the commercial arbitration awards; (2) that in the light of the above-cited Act, the findings of the referees with regard to the facts involved in the controversy submitted to arbitration, as is the case regarding questions of law, are final and not subject to review by the courts, and that § 22 of said statute establishes specifically the reasons that may serve as grounds for vacating an arbitration award and that errors of fact or of law committed by the referees in deciding the controversies submitted to them are not included therein; (3) that said errors of fact or of law do not constitute sufficient grounds to vacate an award pursuant to the provisions of paragraph (c) of § 22, since the provision of said paragraph with regard to any error that may impair the rights of any of the parties should be interpreted as referring to errors in the form of conducting an arbitration proceeding,

---

referees proceeded in an unlawful way, going beyond their functions, in ignoring the terms of the contract; (d) that the referees made the Authority a guarantor of the conditions of the land and of the information regarding it in violation of the express terms of the contract, according to which both parties stipulated that any information of this nature furnished by the Authority was approximate and that it did not assume any responsibility whatsoever as to its correctness; (e) that the referees committed error which appears upon the face of the award in deciding, in violation of the contract, that the document known as "Schedule of Amounts for Contract Payment" constituted an estimate of the project, of the work and of the expenses; (f) that the award was contrary to public policy in allowing a sum additional to the one involved in the contract, and (g) that since the award was erroneous and unlawful to such an extent, it resulted in a violation of the intentions of the Authority when it submitted to arbitration.

In a motion for reconsideration after judgment was rendered, the Authority set up in addition that the arbitration agreement did not include the matter which was submitted to the referees; that the Executive Director did not have the authority to submit said dispute to arbitration, and that the contractor did not request arbitration within the ten days stipulated in the agreement, wherefore the Director did not have any power to go to arbitration either.

the maxim of statutory interpretation *"ejusdem generis"*[4] being applicable; (4) that if it were interpreted that the Legislature intended that the determinations of the referees with regard to the facts and the law were reviewable by the courts, it would be tantamount to imputing to the Legislature an intent to alter the arbitration proceeding and to destroy the purpose thereof. In view of the foregoing, the Court concluded, as a question of law, that the errors allegedly committed by the referees in weighing the facts and applying the law could not constitute grounds for vacating the award. It also concluded, as a question of law, that the referees did not exceed their jurisdiction in any way whatsoever in rendering the award involved herein and likewise, that it had not been established that said award was contrary to public policy. In accordance with said conclusions the trial court rendered judgment affirming the award. The review before us by way of certiorari granted by § 28 of Act No. 376 against the judgment thus rendered is limited to questions of law.

The first question raised by the petitioner in this appeal is that the trial court committed error in deciding that the findings made by the referees with regard to the facts and to the questions of law were final and not reviewable by the courts.

In *Ríos* v. *Puerto Rico Cement Corporation,* 66 P.R.R. 446, decided in 1946, we held that as a general rule an arbitration award "may be impeached or set aside if there is any defect or insufficiency in the submission or award rendering it invalid, or when there has been a substantial and prejudicial departure from the rules governing proceedings by and before arbitrators." Also that "the courts are extremely reluctant to set aside an arbitration award, and they should not permit that the awards be impeached unless

---

[4] "When the referees are in error in refusing to postpone the hearing after just cause therefor was shown, or in refusing to hear relevant and material evidence on the dispute, or when they commit any other error impairing the rights of any of the parties."

they are clearly subject to one of the above objections or there is alleged fraud, misconduct, or the commission of gross or prejudicial error equivalent to a violation of the right to a due process of law." In the subsequent case of *Labor Relations Board* v. *New York & Porto Rico Steamship Co.*, 69 P.R.R. 730, 743, 745, decided March 31, 1949, this Court made a detailed account of the problem raised herein, and decisively supported by decisions and other authorities of general and unquestionable acceptance, it stated:

"The company contends that the award is null by virtue of errors of law made by the Arbitration Committee.
" .          .     .      .      .      .      .       .

"An arbitrator's award is neither a contract nor a judgment, but it partakes of the nature of both. Consequently, the grounds on which an award based on a voluntary submission may be impeached are limited to (1) fraud, (2) misconduct, (3) lack of due process in the conduct of the hearing, (4) violation of public policy, (5) lack of jurisdiction, and (6) want of entirety. Updegraff and McCoy, *supra,* pp. 124–27. This means that an award 'cannot be set aside for mere errors of judgment either as to the law or as to the facts.' [Citation.]

"As the Board pointed out at the oral argument, the Board or this Court might have arrived at a different conclusion if the issues had been submitted to it or to us. *But parties who enter into an agreement of this nature must understand that they have substituted the arbitrator for the courts for the determination of all questions of fact and substantive law.* The company bargained away its right to litigate such questions in the courts. We are powerless to come to its rescue. [Italics ours.]
" .          .     .      .      .      .      .       .

"The situation would be different if the collective bargaining agreement or the submission to arbitration had provided that the Arbitration Committee must decide according to law. 'Where the parties so provide, the arbitrators must follow rules of law, and make their award in accordance with the prevailing legal doctrines. If the arbitration agreement is silent with regard thereto, at common law and under most of the arbitration statutes, the arbitrators may declare law as they please, and

no award will be vitiated because of their legal errors. . . .' [Citations] A leading authority on arbitration is of the view that review by the courts on substantial questions of law would make arbitration more effective. Phillips, *supra,* 47 Harv. L. Rev. at p. 609 *et seq.* But in the absence of a provision in the arbitration agreement or of a statutory requirement to that effect, the arbitrator is free to ignore substantive rules of law." [5]

See also: *Labor Relations Board* v. *Eastern Sugar,* 69 P.R.R. 763, 765 (1949) ; *Labor Relations Board* v. *Soc. Mario Mercado e Hijos,* 74 P.R.R. 376, 380 (1953) ; *Labor Relations Board* v. *Orange Crush of Puerto Rico,* 80 P.R.R. 281, 284 (1958).

In the cases of *Ríos* and *Labor Relations Board* v. *New York & Porto Rico Steamship,* we adopted as the doctrine that would govern among us, those principles related to the effect of an arbitration award and to the sphere of its permissible judicial review which prevail in the different states as well as in the federal jurisdiction, both under the common law and under positive legislation regarding arbitration proceedings, which principles have become on this particular, when not controverted by the lapse of time or because they are so evident, the applicable law of a general and indisputable acceptance. See, among many other subsequent decisions: *Amicizia Societa Nav.* v. *Chilean Nitrate & Iodine S. Corp.,* 274 F.2d 805, 808–09 (C. A. 2d 1960) ; *Application*

---

[5] It was made clear in this case that when we stated in the case of *Ríos* v. *Puerto Rico Cement Corp., supra,* that ordinarily an arbitration award may be impeached or set aside if there is any defect or insufficiency in the submission or award rendering it invalid, or when there has been a substantial and prejudicial departure from the rules governing proceedings by and before arbitrators, there was no intention of deciding that an award may be impeached because of errors of substantive law, but that when the referee has jurisdiction only the errors involving fraud, misconduct or lack of due process could be invoked before the courts against the award; adding to these grounds the violation of public policy and lack of entirety. Although these cases arise from labor-management disputes, in the particular aspect now before us, there are no differences with regard to the rule to be followed in commercial arbitration.

*of Harris,* 337 P.2d 832, 833–34 (1959); *Smith* v. *Hillerich & Bradsby Co.,* 253 S. W. 629, 630 (1952); *Kesslen Bros. Inc.* v. *Board of Conciliation & Arb.,* 158 N.E.2d 871, 873 (1959); *Wetsel* v. *Garibaldi,* 323 P.2d 524, 529–30 (1958); *Arbitration: A. D. Juilliard & Co., etc.,* 152 N.Y.S. 2d 394, 396 (1956); *Brighton Mills* v. *Rayon Corp., etc.,* 122 N.Y.S. 2d 113 (1953); *Wagner* v. *Russeks Fifth Ave. Inc.,* 119 N.Y.S. 2d 269, 270 (1953); *Griffith Co.* v. *San Diego College for Women,* 289 P.2d 476, 481, 484–85 (1955); *Dembitzer* v. *Gutchen,* 159 N.Y.S. 2d 327, 331–32 (1957); *Karppiner* v. *Karl Kiefer Machine Co.,* 187 F.2d 32, 34–35 (C. A. 2d 1950); *In re Suffolk & Nassau Amusement Co., etc.,* 143 N.Y.S. 2d 427, 431–32 (1955); *Downer Corp.* v. *Union Paving Co.,* 304 P.2d 756 (146 C. A. 2d 708, 714–16, 1956); *Pennsylvania Electric Co.* v. *Shannon,* 105 A.2d 55, 57–58 (1954); *Application of Shapiro,* 97 N.Y.S. 2d 644, 649 (1950); *Loretta Realty Corp.* v. *Massachusetts Bond & Co.,* 114 A.2d 846, 848–49 (1955); *Crofoot* v. *Blair Holdings Corp.,* 260 P.2d 156, 170–72 (1953). *Cf. Wilko* v. *Swan,* 346 U. S. 437, 435, 438 (1953); *Bernhardt* v. *Polygraphic Co.,* 350 U. S. 198, 202, 204 (1956); *Steelworkers* v. *American Mfg. Co.,* 363 U. S. 564, 567–68 (1960); *United States* v. *Moorman,* 338 U. S. 457, 461, 463 (1950); *Mork* v. *Eureka Security Fire, etc.,* 42 N. W. 2d 33, 38–39 (1950).[6]

---

[6] See, for example, the arbitration proceedings of California from the middle of the past century, as they were fundamentally modified by the 1927 legislation based on the *State Arbitration Bill* supported by the American Association of Arbitration, also followed by other states, California Code of Civil Procedure, §§ 1280 to 1293, 19 West's Annotated Cal. Codes, pp. 626, 672; the New York Civil Practice Act, § 84 (1920, 1937), Gilbert-Bliss Civil Practice Act of New York Annotated, Vol. 6B, §§ 1448–1469; United States Arbitration Act (1947), 9 U.S.C.A. §§ 1–11.

The doctrine in the Spanish law contains norms similar to the Anglo-American doctrine. Under the arbitration proceedings provided by the Law of Civil Procedure of 1881, §§ 487 and 790–839, which in the absence of any other applicable law governed here—*cf. Mas* v. *Llona,* 31 P.R.R. 28 (1922)—until Act No. 376 of 1951 went into effect, if the parties chose to submit the controversy to the judgment of arbitrators, these had to be *Lawyers* (§ 789 Engl. version) and the judgments of the arbitrators

In *Wilko* v. *Swan, supra*, the Supreme Court having in mind precisely these very characteristics of the arbitration award held that an agreement to submit to arbitration a controversy arising between a buyer and seller of securities under the Securities Act of 1933 was invalid because it was contrary to public policy as found in that statute, since by the agreement to arbitrate the purchaser waived certain judicial remedies provided by said Act and which resulted in his benefit. The Court stated that although the provisions of the Securities Act advantageous to the buyer apply, their effectiveness in application is lessened in arbitration as compared to judicial proceedings. It also stated that this case required subjective findings on the purpose and knowledge of an alleged violator of the Act which had to be not only determined but applied by the arbitrators *without judicial instruction on the law*. As their award could be made without explanation of their reasons and without a complete record

should be *according to law* and the claims and evidence, according to the *formalities* provided for judgments in ordinary actions. (Section 815 Engl. version.) The judgment of the arbitrators *was appealable in both aspects* to the audiencia of the district and the prosecution of the appeal had to conform to the rules established for appeals from final judgments in actions of greater import. (Sections 817, 822 Engl. version.)

On the other hand, if the parties interested in the controversy chose to submit it to the judgment of amicable compounders, the latter had to be men of legal age, in the full enjoyment of their civil rights, and know how to read and write (§ 826 Engl. version) and they shall decide the questions submitted to their decision *according to their knowledge and belief without being subject to legal forms* (§ 832 Engl. version). From such judgments there was no remedy except that of an *appeal* for annulment of judgment (§ 835 Engl. version) in cases where the amicable compounders rendered a judgment outside of the period fixed in the compromise or upon a matter not submitted to their decision, or upon a matter which is not of a civil nature or that is included in the exceptions provided by § 487 (§ 1689(3) Engl. version). See the judgments rendered by the Supreme Court of Spain on December 6, 1941, holding that the judgments of the amicable compounders who have not exceeded their authority with regard to the matters or issues submitted to their decisions shall stand and become incontestable, *whether or not they are correct as to substantive law,* etc.; those of November 15, 1934 and March 15, 1933; and the judgment rendered on April 17, 1943, holding that the function of the Supreme Court *is not to correct any deficiency or omission* found in the award

of their proceedings, the arbitrator's conception of the legal meaning of such statutory requirements as "burden of proof," "reasonable care" or "material fact" could not be examined, and the power to vacate an award was limited. (Section 10 of the United States Arbitration Act is cited, 9 USCA § 10.) In an unrestricted submission, such as the one involved in that case, the opinion goes on to say, the interpretations of the law by the arbitrators in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in interpretation. Setting forth that this case involved two policies not easily reconcilable, the Court finally stated that Congress has afforded participants in transactions subject to its legislative power an opportunity to secure prompt, economical, and adequate solution of controversies through arbitration, if the parties are willing to accept *"less certainty of legally correct adjustment,"* but although recognizing the advantages that prior agreements for arbitration may provide for the solution of commercial

---

rendered by the amicable compounders, but only to set aside whatever constitutes an excess of authority therein. The arbitrator or amicable compounder is described by Escriche in his *Diccionario Razonado de Legislación y Jurisprudencia,* referring to the *Partidas,* as "the good man to whom the parties bind themselves and entrust the task of adjusting and settling by *equitable means* their controversies . . . The arbitrators may hear the claims of both parties, reconcile, and settle their disputes, in any manner that they deem appropriate; and *their decisions shall be valid,* although they do not commence the action by the regular proceeding of complaint and answer, and although *they do not observe all the other formalities* imposed on the judges, *provided they act in good faith and without fraud . . . ."* Escriche indicates the difference which existed in the *Partidas* between the *referee at law* or *arbiter* who had to proceed with and decide the issues submitted to him according to law and the *arbitrators* or amicable compounders who could proceed with and decide the controversies submitted to them according to their best knowledge and belief, without being subject to the law nor to any legal forms. There is no doubt that the Anglo-American arbitrator and the Spanish amicable compounder correspond historically speaking to a common ideology with regard to the nature and purposes of said functions. Furthermore, see the recent Spanish legislation—Act of December 22, 1953—which regulates the arbitration proceedings in Private Law, and whereby norms still more similar to the Anglo-American arbitration proceedings than the former are adopted.

controversies, the Court believed that the intention of Congress concerning the sale of securities was better carried out by holding invalid such an agreement for arbitration of issues arising under the Act.

The conclusion of the trial court regarding the error assigned is correct and it constitutes a declaration of an axiomatic nature, so to speak, of the law covering this particular aspect. Petitioner sustains, however, that such norms do not prevail in Puerto Rico, and that the Court was bound to review the award on its merits and to vacate it on the basis of the errors committed by the arbitrators and of erroneous conclusions of law. In support of the contention it invokes the provisions of paragraph (c) of § 22 of Act No. 376 of 1951.

Paragraph (c) numerates the cases wherein an award may be vacated, such as when the referees are in error in refusing to postpone the hearing after just cause therefor was shown, or in refusing to hear relevant and material evidence on the dispute, or *"when they commit any other error impairing the rights of any of the parties."* The trial court, following the principle of *"ejusdem generis"* concluded that an error of a similar or like nature to those procedural errors mentioned above could be included in the last provision. Actually, when said provision is considered in the light of the section and the statute taken as a whole, of the source thereof and of the original decisions, it cannot be said that the rule of statutory construction is altogether inapplicable or that the conclusion of the trial court was erroneous.

However, considering that if the petitioner is correct, the prevailing rule here with regard to arbitration awards and their review by the courts would be in conflict as much with the classic principle of the Anglo-American doctrine as of the Spanish doctrine of the amicable compounder, and with the decisions of this Court rendered prior to the enactment of Act No. 376, we concluded that it is preferable to

ascertain the real legislative intent rather than to rely on a rule of interpretation. Certainly, if it had been the Legislature's intent to subject arbitration awards to review on their merits for errors of fact and of law involved in the controversy, such would be the rule applied by this Court, no matter how much this intent departs from the philosophy and the purposes of a submission to arbitration.

Act No. 376 authorizes and regulates in a sweeping manner the commercial arbitration agreements and it provides the way in which said agreements shall be enforced by the courts. It excluded, like other similar statutes, labor arbitration, which would continue to be governed by the labor-management legislation. The provisions of this statute are substantially patterned on the arbitration legislation of California and on similar laws of other states, on the New York proceedings, and on the United States Arbitration Act. Sections 22 and 23, the only ones which provide for judicial intervention to reverse, and modify or correct an award, are an almost identical copy of §§ 1462 and 1462-*a* of New York; 1288 and 1289 of California and of §§ 10–11 of the Federal Act (footnote 6 above).[7] Our Spanish version of paragraph (*c*) did not make a literal translation of the words "*misconduct*" and "*misbehavior*," but evidently, the Legislature did not change the meaning of said paragraph upon adopting the same. The original legislation sets forth in terms of "*misconduct*," which constitutes grounds for the reversal of the award, the fact that the referees *refuse* to postpone the hearing when there is just cause therefor, or when they *refuse* to hear relevant and material evidence on the dispute. Our version sets forth this same situation in terms of error:

---

[7] Paragraph (*c*) of § 1462 of New York, § 1288 of California, and § 10 of the Federal Act are identical: "Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." (California reads misbehaviors.)

when the referees "are in error in refusing." Webster gives, the terms *"misconduct"* and *"misbehavior"* as synonymous —Black's Law Dictionary, IV Ed.—and they are so used in the English version of paragraph (c).[8] It cannot be said,. in the absence of clearer indicia showing a specific different intent on the part of the Legislature, that a similar expression in terms of error used subsequently in relation to the English *"misbehavior,"* synonym of *"misconduct"*: or when they "commit any other *error* impairing" ... was used with a meaning different from the one it has in the legislation from which it was taken and in its case law, to the extreme of trying to include any error of the referees in the weighing of the facts or in the ascertaining of the rules of law that a court would apply to the controversy.

If this would have been the legislative intent, thus constituting a radical departure from the original legislation and from the case law interpreting it, known to the lawmakers, our statute would have included more explicit provisions providing that the award should conform to the applicable law, as it was provided by the Spanish Law of Civil Procedure with regard to the arbitrators, or as it would be the case under a provision to that effect in a submission agreement in the Anglo-American arbitration proceedings, and besides, it would have also contained any other provisions necessary for an adequate review of such errors on the merits.[9]

---

[8] "Guilty of misconduct . . . *or of any other misbehavior.*"

[9] Section 4 of the law of December 22, 1953 regulating the arbitration proceedings in the Private Law and which substituted the provisions of the Law of Civil Procedure of 1881 regarding arbitration—Medina y Marañón, *Leyes Civiles de España,* 1958—provides that there would be only one type of arbitration, whether the arbitrators shall render their judgments *according to law,* or *according to their knowledge and belief* only, the parties to the compromise (more like the Anglo-American proceedings) being free to choose any of these solutions. If nothing is said to that effect, it shall be understood that they chose judgment according to the law. Sections 17, 20, 27 and 28, also provide in cases of awards rendered in arbitration proceedings according to law for a right to appeal to the

Section 21 of Act No. 376 does not require judicial affirmance in order to establish the validity and effectiveness of an award otherwise valid, and if affirmance is requested, the court shall grant it unless the award is reversed, modified or corrected, as provided in §§ 22 and 23. No other judicial intervention is permitted in law against the award itself. According to the well-settled case law interpreting similar provisions of the legislation on which our proceedings are patterned, aside from the requisite that the award shall be made in writing and signed by the referees or a majority thereof (§ 20), the referees are not required to make findings of fact nor conclusions of law, nor to explain the reasons for their decision, nor are they required to substantiate the evidence under oath nor to take it in writing or make a record thereof; they shall decide upon the relevancy of the evidence submitted by the parties and the acceptance thereof, *without having to conform with the rules of evidence* (§ 17); and since ordinarily, the referees are persons having a special knowledge on the matters submitted to their consideration, they may form a judgment and decide said issues, making

Supreme Court for annulment of judgment for violation of the law or breach of procedural forms; § 29 provides that in equitable arbitration there is no obligation to comply with procedural formalities nor to conform to law with regard to the merits, but that the controversy may be settled according to the best knowledge and belief of the arbitrators. In that case—§ 30—there shall be no remedy except that of an appeal for annulment to the Supreme Court on the grounds provided for in § 1691(3)—ante footnote 6—and in §§ 1774–1780, Law of Civ. Proc. As it may be seen, if the parties do not choose that the award be rendered in accordance to law, they cannot obtain, as in Anglo-American arbitration, the right to judicial review of the award on its merits. A convincing statement of the important role played by arbitration in modern times full of complex mechanisms, as a convenient social means to settle controversies and conflict of interests without having to resort to the coercive power of the courts, is made manifest upon explaining the recent legislation, in the statement of motives preceding the publication of the Law of 1953— *Enciclopedia Jurídica Española,* App. 1953, p. 105—wherein views are set forth similar to the holding of the American courts with regard to the convenience of encouraging such proceedings and of enforcing arbitration awards as a desirable public policy.

use of their own personal knowledge and experience with regard to said matters. See the cases cited above and *Hudson Lumber Co.* v. *United States Plywood Corp.*, 269 P.2d 93, 95–96 (1954); *Sampson Motors* v. *Roland*, 263 P.2d 445, 447 (1953); *Sapp* v. *Barenfeld*, 212 P.2d 233, 238–39 (1949); *Application of Spectrum Fabric Corp.*, 139 N.Y.S. 2d 612, 617 (1955); *Avila Fabric* v. *Exrel Garment*, 135 N.Y.S. 2d 182, 183 (1954); *Calvine Cotton Mills* v. *Textile Workers Union*, 79 S. E. 2d 181, 183 (1953); Annot., 154 A.L.R. 1210.

In such circumstances and for practical reasons of a feasibility, we do not believe that the Legislature intended in these cases that the Superior Court shall review arbitration awards on their merits on account of any error of judgment or of interpretation of the facts or of the law, without providing at the same time the adequate means for a thorough determination to be made by the Court as to whether these errors were committed in the light of the facts involved and of the law such as the trial court would deem applicable, unless as a matter of fact a trial de novo be held in the Superior Court which clearly is not conceivable under Act No. 376. In accordance with the foregoing, we must conclude that Act No. 376 of 1951 did not authorize the judicial review on its merits of an arbitration award otherwise rendered with authority therefor, and the only remedy available against said award is its revocation, modification or correction in the cases provided for in §§ 22 and 23 of said Act. Therefore, the enactment of Act No. 376 did not set aside the decisions of this Court prior thereto, which prevented the judicial review of an award on its merits.

The following four errors assigned by the petitioner to the trial court: (a) in deciding that the referees did not exceed their jurisdiction in rendering the award; (b) in holding that the decision rendered by the referees is not contrary to public policy; (c) in finding as a question of fact that the dispute among the referees turned on the amount

of money which the petitioner was bound to pay the contractor in addition to the contract price, and (d) in deciding that the submission agreement entered into by the parties did not specify that the decisions rendered by the referees should be according to law, were not committed. As argued by petitioner, these errors necessarily pass on the merits of the award and involve questions of *fact* with regard to the interpretation of the contract and of the evidence received by the referees which are not subject to judicial review as we have already set forth when deciding the first error.

■ Irrespective of the foregoing, we have carefully examined the award in the light of the dispute submitted to the referees and of the grounds for impeachment invoked before the trial court, of the evidence which they had before them, and of the provisions of § 22 of said Act, and we have found no evidence in the record to warrant the conclusion that the award was rendered in violation of said provisions, or in manifest disregard or ignorance of the law contrary to its interpretation, as stated in the case of *Wilko* v. *Swan, supra;* or as set forth by other courts, that the award is from its face so manifestly erroneous in the application of the correct norms which should govern the controversy that it would in fact amount to a perpetration of fraud against one of the parties, who in good faith submitted itself to the good judgment of the referees. *Covey* v. *Arrow Coach Lines,* 288 S. W. 2d 192, 196 (1956); *Sampson Motors* v. *Roland, supra* at 447; *Popcorn Equipment Co.* v. *Page,* 207 P.2d 647, 649 (1949); *Fine Foods, Inc.* v. *Office Employees International Union,* 185 N.Y.S. 2d 1021, 1022–23 (1959); *Amicizia Societa Nav.* v. *Chilean Nitrate and Iodine S. Corp., supra* at 808–09; *Miller, Inc.* v. *Wilmington Housing Authority,* 179 F. Supp. 199, 202 (1959).

■ The question on which petitioner lays more stress before us is that the referees gave an erroneous interpretation to the contract in granting an additional compensation

for the filling because, as petitioner sustains, in so doing, they changed the nature of the lump-sum contract to one for unit price, and that this is contrary to the public policy followed by the Authority in that kind of contracts for the construction of housing projects. This was also their chief contention before the referees. The record does not sustain petitioner's contention. According to paragraph (*b*) of clause No. 17 of the contract transcribed in the record, it was those disputes with regard to the granting of claims, or to the amount of the claims, involving a *change in the contract price*, that were precisely reserved to be decided by the Executive Director subject to arbitration. The other disputes were to be decided some exclusively by the Authority, its decision being final and binding, and others exclusively by the Executive Director.

At the request of the contractor who found that the drawings of the contract did not correspond to the real situation of the site, the Authority drew new topographic plats and as a consequence thereof, it issued Change Order No. 13, ordering the contractor to furnish additional fill. The Authority itself changed the contract price pursuant to said change order and increased it on the basis of 80 cents per cubic yard, the price agreed upon. The controversy arose from the discrepancy of views between the parties with regard to the total amount of the increase on the basis of the amount of necessary additional fill, and not as to whether the original contract price could be changed, the contractor contending that in the change order issued by the Authority the latter had considered only the fill needed in a part of the area, and not for the whole area, and that the topographic conditions were different from the ones shown in the original plats, and that this constituted a change of the terms of the contract.

According to the evidence brought before the referees, they concluded, as a question of fact, that when the Authority

called for bids on the project, it had made an exact estimate in order to inform the cost thereof of the fill to be placed in the area involved, which estimate was delivered to the contractor by the Authority; that the Authority later admitted that there were errors in the topography and it ordered new topographic surveys to be made, and that although the contract was a lump-sum contract, the true situation was that during the execution thereof the amounts of the filling were corrected on account of deficiencies or errors found in the topographic drawing prepared by the Authority, which it admitted when it issued Change Order No. 13. They also concluded, as a question of fact, that it was impossible for the contractor to determine the additional fill required to compact the soil existing there, and that the one able to determine this situation was the Authority, because of the surveys made for that purpose. (Findings Appendix A.) According to the record, the conclusions of the referees could not be challenged even in the case of the conclusions of a lower court.[10] The controversy decided by the referees clearly falls within the ambit of clause No. 17 of the contract, which might result in a change of the contract price, without meaning that the nature of the contract was changed by the award from a lump-sum to a unit price contract, in violation of a public policy with regard to this type of contracts.

▇ In the last error argued by the petitioner it attempts to impeach the submission itself, alleging that the Executive Director lacked the power to submit this controversy to arbitration. This contention was made for the first time when the petitioner requested the Superior Court to reconsider the judgment affirming the award, and it was held that the Authority had voluntarily submitted to the jurisdiction of

---

[10] Section 1485 of the Civil Code does not permit a contractor of a lump-sum contract to request an increase in the price, even if that of the materials or wages has increased, *but he may do so when any change increasing the work should be made in the plans*, provided the owner has given his authorization. This was the situation here.

the referees. One of the grounds is that the contractor did not make use of his right to request arbitration within the term stipulated in the contract, and it is contended that his claim was denied on November 9, 1953, and it was not until January 13, 1954, after the term of 10 days provided for in paragraph (*b*) of clause No. 17 of the contract had expired, that the contractor requested arbitration. In effect, the record shows that on November 9, 1953 the Executive Director sent a letter to Zequeira denying his claim for additional payment for fill. But also, after this communication, additional conversations were held between the parties with regard to the dispute; the Executive Director suggested to the contractor the convenience of having the engineers of the Foundation Engineering Co. appear before the Director to discuss the report submitted by said firm which sustained the contractor's position, and in view thereof, in a letter dated December 1, 1953, the latter requested the Director to fix the time and date for such conference to see whether they could reach a decision satisfactory to both parties. In a letter sent on January 4, 1954 by the Executive Director to the contractor, the former refers to a conference held on December 4, and also to an assertion made by him in said conference to the effect that there was no basis for the claim. In view of these facts it is clear that the claim was finally denied on January 4, 1954, and the request for arbitration made on January 13 was on time. The Director himself seemed to have understood it so.

▮ The other ground invoked by petitioner challenging the power of the Executive Director to submit the controversy to arbitration is based on the fact already decided in discussing the foregoing errors that the submission to arbitration made by the Executive Director of the dispute involved herein was a violation of the contract, since it entailed a change in the nature of the contract from lump-sum to unit price contract. Actually, the Authority does not argue that the con-

troversy could not be submitted to the referees, or that the submission was contrary to law, but it sustains that it was the Authority itself and not its Executive Director who had the power to do so.

Without delving into the field of the specific spheres of action of the Authority and of its Executive Director, since it is unnecessary, the record establishes that the Authority not only submitted to the jurisdiction of the referees by appearing before them through its attorneys, making its contentions and submitting the controversy to the decision of the referees, but that it never invoked, before the issuance of the award, the intervention of the Superior Court impeaching the submission made by the Executive Director, nor requested the Court to stay the arbitration proceedings, as it should have done pursuant to the procedure provided by Act No. 376. When it impeached the first award which was reversed, the Authority did not raise this question either, consenting that the controversy be submitted once more to arbitration. The authority waived its right to make any further similar contention when it submitted to the proceedings, and the contention made for the first time after the award was rendered was too late, unless the situation would have been such as provided in paragraph (c) of § 22. Cf. *Brotherton, Inc.* v. *Kreielsheimer*, 83 A.2d 707, 709 (1951); *In re General Dry Cleaners*, 75 N.Y.S.2d 615, 619 (1947); *In re Nadalen Full Fashion Etc.*, 134 N.Y.S. 2d 612, 614–15 (1954); *Sapp* v. *Borenfeld, supra* (1949).

In view of the reasons set forth in this opinion, the writ of certiorari shall be quashed and the judgment appealed from affirming the arbitration award shall remain in full force and effect. The original record shall be remanded for further proceedings not inconsistent with this opinion.

# APPENDIX A

## "FINDINGS"

"1—That the Authority informed the Contractor in a document delivered to him, 'Schedule of Amounts for Contract Payments' an itemization by units of work and labor of the contract setting forth the fill to be placed on the parcel and streets in the amount of 70,237 and 16,596 cubic meters respectively. That the accuracy of such amounts up to the last figure was computed by the Authority in order to determine the cost of this fill, as well as of other items of the contract and the cost of the contract itself, which estimate was used by the Authority as the basis for the announcement of the public bid and to determine whether it could award the work. We believe, therefore, that this estimate was made with accuracy by the Authority in order to know the cost of the work to be made. In fact, to our judgment, it constitutes an estimate of the work and of the expenses.

2—That although the contractor calculated the costs of these items, the true fact is that such items and their amounts were estimated by the Authority and delivered to the contractor. Consequently, it was not the Contractor who prepared the itemization of the work and labor.

3—That had it not been that the Contractor was able to find out with some accuracy the amount of fill placed by him by means of the numbers on the trucks used in the work, he would have been prevented from determining the additional fill, verifying the errors existing on the Topographic Map furnished by the Authority.

4—That the Authority admitted that the topography contained several errors in ordering that new topographic surveys be done and in sending to the Contractor Change Order No. 13 dated December 4, 1950, wherein the amount of excavations was not only corrected by increasing the amount of fill to be placed thereon but it was actually reduced. Such modifications increased the cost items computed by the Authority in order to determine the cost of these works and of the contract as a whole.

5—That although it was a lump-sum contract, the true fact is that during its execution the fill items had to be revised on account of deficiencies or errors in the topographic map pre-

pared by the Authority, the latter thus admitting this fact by issuing Change No. 13.

6—That when the Contractor challenged the Change Order for setting forth an increase in the fill less than the amount claimed by the Contractor, the Authority told him to make his own survey of the topography of the parcel. This work was entrusted to the Foundation Engineering Corporation. A copy of said survey was delivered to the Authority for its consideration as requested.

7—That the contention made by the Authority that the Contractor was bound to furnish the fill up to a specific level, without a previous determination of the volume of fill, is to our judgment, beyond our consideration, since a topographic plat and an itemization of the fill involved herein were furnished by the Authority for these purposes.

8—That it was impossible for the Contractor to determine the additional fill which would have been necessary to compact the land, and that the person capable of determining this situation by reason of the surveys made to that effect was the Authority itself.

9—That the amount of fill placed on the area, according to the survey made by the Foundation Engineering Corporation, amounts to 120,603 cubic meters.

10—That the Contractor, therefore, placed 33,770 cubic meters of fill in excess of the amount computed and stipulated by the Authority. That 3,550 cubic meters should be deducted from this amount, which according to the survey made by the Foundation Engineering Corporation, were placed under the buildings up to the final grade line of the parcel, in addition to 1,759.80 cubic meters which were accredited to Change Order No. 13."